
DA 07-0299

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2009 MT 261

STATE OF MONTANA, ex rel. STEVE BULLOCK,

    Plaintiff and Appellant,

  v.

PHILIP MORRIS, INC., et al.,

    Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV 1997-306
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        David R. Paoli, John A. Kutzman, Paoli, Latino & Kutzman, P.C., Missoula, Montana

    For Appellee Philip Morris USA Inc.:

        J. Daniel Hoven, Sara S. Berg, Browning, Kaleczyc, Berry & Hoven, P.C., Helena, Montana

    For Appellees R.J. Reynolds Tobacco Company and Lorillard Tobacco Company:

        William Evan Jones, Lawrence F. Daly, Charles E. Hansberry, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

    For Appellees Certain Subsequent Participating Manufacturers:

        Sean M. Morris, Worden Thane P.C., Missoula, Montana

        Robert J. Brookhiser, Elizabeth B. McCallum, Howrey LLP, Washington, D.C.

Submitted on Briefs:  December 19, 2007

Decided:  August 5, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The State of Montana appeals from an order entered by the First Judicial District Court, Lewis and Clark County, granting the motion of Philip Morris USA Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company to compel arbitration. We reverse and remand for further proceedings.

## BACKGROUND

¶2 This appeal arises out of litigation that began in 1997, when the State sued the nation's largest tobacco manufacturers for the public health costs caused by the industry's alleged ongoing misrepresentations to consumers about the risks of smoking. Other states and territories filed similar litigation. In 1998, four of the tobacco manufacturers (Philip Morris, R.J. Reynolds, Lorillard, and Brown & Williamson Tobacco Corp.[1]) entered into a Master Settlement Agreement (MSA) with 46 states (including Montana[2]), the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, American Samoa, and the Northern Mariana Islands. These four defendants are referred to in the MSA as "original participating manufacturers" (OPMs), and the states, territories, and District of Columbia are referred to as the "Settling States." The MSA permits other tobacco companies to join the settlement in order to avoid future litigation, and the companies which have done so are designated "subsequent participating manufacturers" (SPMs). A number of SPMs have intervened in the present suit. Finally, the original participating manufacturers and the subsequent participating manufacturers are known collectively as

---

[1] Brown & Williamson merged with R.J. Reynolds in 2004.
[2] The tobacco companies and four states (Florida, Minnesota, Mississippi, and Texas) entered into individual settlement agreements.

3

"participating manufacturers" (PMs), while the tobacco companies that are not signatories to the MSA are known as "non-participating manufacturers" (NPMs).

¶3 In exchange for the Settling States' release of all claims, the PMs agreed to certain marketing restrictions and to make annual payments to the Settling States "for the advancement of public health" and "the implementation of important tobacco-related public health measures." The PMs do not make payments directly to individual Settling States; rather, each PM is required to make a single, nationwide payment into an escrow account, and the amounts are then allocated among the Settling States. Each PM's individual contribution to the account is based on its market share. Likewise, each Settling State receives an "allocable share" of the sum of all payments made by the PMs in the year in question. Montana's allocable share is 0.4247591%. The State received $24.8 million in MSA funds in 2006; $25.8 million in 2007; and $34.6 million in 2008.

¶4 The MSA assigns several responsibilities to an "Independent Auditor," which is defined as "a major, nationally recognized, certified public accounting firm."[3] Specifically, the Independent Auditor

> shall calculate and determine the amount of all payments owed pursuant to [the MSA], the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing . . . .

In calculating the PMs' annual payments, the Independent Auditor takes the base amount owed by the PMs for the calendar year and then applies a series of adjustments,

---

[3] The parties selected PricewaterhouseCoopers as the Independent Auditor.

reductions, and offsets. Of relevance to this case is the Non-Participating Manufacturer Adjustment (NPM Adjustment). The parties to the MSA recognized that the marketing restrictions and payment obligations imposed on PMs could give NPMs a competitive advantage and cause the PMs to lose market share to the NPMs. Moreover, they recognized that a transfer of market share to the NPMs would undermine the purposes of the MSA. Thus, the NPM Adjustment serves to level the playing field by reducing the PMs' annual payment obligations if it is determined that (1) the PMs collectively lost more than two percent of their pre-MSA (i.e., 1997) aggregate market share to NPMs during the year in question and (2) "the disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to" this loss.

¶5     The NPM Adjustment typically applies to the allocated payment for each Settling State; however, a Settling State can avoid the NPM Adjustment if it "continuously had a Qualifying Statute . . . in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year." A "Qualifying Statute" is a statute, regulation, law, or rule that "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of [the MSA]." If a Settling State meets these requirements, then the NPM Adjustment is inapplicable to that Settling State and is reallocated among the other Settling States on a pro rata basis.

¶6     The present litigation concerns the PMs' annual payments for 2006. The PMs had lost the requisite percentage of market share in 2003, and an economic consulting firm

5

had determined that the disadvantages imposed by the MSA were a "significant factor" contributing to that loss. Thus, the PMs asked the Independent Auditor to offset their 2006 payments by the amount of the 2003 NPM Adjustment. In response, the Settling States contended that they each had enacted Qualifying Statutes which were in full force and effect in 2003 and that the Independent Auditor should presume, in the absence of substantial evidence to the contrary, that state officials had "diligently enforced" those statutes. The PMs, however, argued that the Independent Auditor must "presume just the opposite," i.e., that the statutes had *not* been diligently enforced.

¶7    The Independent Auditor declined to apply the NPM Adjustment to the PMs' 2006 payments. Noting the parties' dispute over whether the Settling States continuously had Qualifying Statutes "in full force and effect" and whether they "diligently enforced" the provisions of such statutes, the Independent Auditor explained that it was "not charged with the responsibility under the MSA of making a determination regarding this issue." Moreover, the Independent Auditor stated that it was "not qualified to make the legal determination as to whether any particular Settling State has 'diligently enforced' its Qualifying Statute." Thus, the Independent Auditor concluded that "[u]ntil such time as the parties resolve this issue or the issue is resolved by a trier of fact, the Independent Auditor will not modify its current approach to the application of the NPM Settlement Adjustment." In effect, the Independent Auditor presumed that the Settling States had diligently enforced their Qualifying Statutes.

¶8    On April 10, 2006, the OPMs served notice that they disputed the Independent Auditor's final calculations. Nevertheless, the OPMs paid the full amounts calculated by

6

the Independent Auditor, though R.J. Reynolds and Lorillard paid the sums attributable to the disputed amount into the Disputed Payments Account provided for in the MSA.

¶9    The State then commenced the instant action on May 8, 2006, by filing a motion for declaratory order.  The State alleged that Montana had enacted a Qualifying Statute (§§ 16-11-401 to -404, MCA) in 1999 when the Legislature adopted the Model Statute set forth in Exhibit T of the MSA.  The State further alleged that the provisions of §§ 16-11-401 to -404, MCA, were continuously in full force and effect during 2003 and that the State had diligently enforced these provisions during that year.  The State relied on the presumption contained in § 26-1-602(15), MCA ("[o]fficial duty has been regularly performed") and also listed certain actions it had taken to enforce §§ 16-11-401 to -404, MCA.  The State asked the District Court to enter an order declaring that Montana diligently enforced the provisions of §§ 16-11-401 to -404, MCA, during 2003.  In the alternative, the State asked the District Court to determine that the PMs "have released, waived, or are estopped to assert any claim that Montana did not diligently enforce the Model Statute with regard to the 2003 escrow payment."  The State alleged that the court had jurisdiction under § VII(a)(2) of the MSA, which provides that each individual state court retains exclusive jurisdiction for the purposes of "implementing and enforcing" the MSA and the Consent Decree as to such Settling State.

¶10    The OPMs responded with a motion to compel arbitration (which the intervening SPMs joined).  They relied on § XI(c) of the MSA, which states:

> **Resolution of Disputes.**  Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute

7

concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. . . .

The OPMs argued that the parties' dispute was one "arising out of or relating to calculations performed by, or . . . determinations made by, the Independent Auditor." The OPMs also asserted that the parties' dispute concerned the "application" of an adjustment "described in subsection IX(j)" (namely, the NPM Adjustment). The OPMs next argued that allowing Settling States to challenge the Independent Auditor's determinations in their respective state courts would "wreak havoc" on the MSA's payment system. Lastly, the OPMs contended that the law favors arbitration when a contract contains an arbitration clause.

¶11    In response, the State emphasized that it sought a ruling only with respect to its own diligent enforcement efforts and that it was not asking the District Court to calculate any payments or adjustments. The State also pointed out that the arbitration provision applies only to "calculations performed by" and "determinations made by" the Independent Auditor, and the State argued that the Independent Auditor is, by definition, an accounting firm which is not vested by the MSA with responsibility for evaluating the exercise of prosecutorial discretion by the various state attorneys general to determine whether their respective Qualifying Statutes have been diligently enforced.

¶12    The District Court agreed with the State that the MSA does not define "diligent enforcement," does not outline the standard by which a Settling State meets this requirement, and does not expressly charge the Independent Auditor with the duty of

determining whether a Settling State has "diligently enforced" its Qualifying Statute. Nevertheless, the court concluded that the parties' dispute "concerning the Auditor's determination not to apply the 2003 NPM Adjustment" was a matter for arbitration. The court first observed that the issue of whether "diligent enforcement" has occurred is "necessarily linked" to whether the NPM Adjustment applies. The court then reasoned that although the Independent Auditor did not explicitly determine that the Settling States were diligently enforcing their Qualifying Statutes, the Independent Auditor "presumed" that they were. In the District Court's view, this "presumption of 'diligent enforcement' is essentially a determination and, under Section IX(c), MSA, this determination is a matter for arbitration." The State now appeals.

## ISSUE

¶13    The sole issue on appeal is whether the District Court erred in granting the PMs' motion to compel arbitration.

## STANDARD OF REVIEW

¶14    This Court reviews a district court's order granting a motion to compel arbitration de novo. *Martz v. Beneficial Montana*, 2006 MT 94, ¶ 10, 332 Mont. 93, 135 P.3d 790.

## DISCUSSION

¶15    Arbitration is a matter of contract, and a party cannot be required to submit to arbitration a dispute which it has not agreed so to submit. *AT&T Technologies v. Communications Workers of America*, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418 (1986); *accord Willems v. U.S. Bancorp Piper Jaffray*, 2005 MT 37, ¶ 13, 326 Mont. 103, 107 P.3d 465. Moreover, unless the parties "clearly and unmistakably" provide otherwise, the

question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *AT&T Technologies*, 475 U.S. at 649, 106 S. Ct. at 1418; *cf. Kingston v. Ameritrade*, 2000 MT 269, ¶ 13, 302 Mont. 90, 12 P.3d 929 ("[A] district court may not order arbitration if there is a substantial and bona fide dispute over whether there exists an agreement to arbitrate." (citing § 27-5-115, MCA)). Thus, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate *that dispute*. *Mitsubishi Motors v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353 (1985); *cf. Willems*, ¶ 13 ("When a district court is asked to compel arbitration of a dispute, the threshold inquiry is whether the parties agreed to arbitrate."). When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts. *See First Options of Chicago v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995); *Willems*, ¶ 13 ("Because arbitration is a matter of contract, the rules of contract apply."); § 28-3-102, MCA ("A contract is to be interpreted according to the law and usage of the place where it is to be performed . . . ."). Indeed, the MSA itself states that "[t]his Agreement (other than the Escrow Agreement) shall be governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State."

¶16 Under Montana law, the construction and interpretation of a contract is a question of law for the court to decide. *Ophus v. Fritz*, 2000 MT 251, ¶ 19, 301 Mont. 447, 11 P.3d 1192. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. "When a contract is reduced to writing, the intention

10

of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect if it can be done without violating the intention of the parties." Section 28-3-201, MCA. Laws existing at the time a contract is formed become part of the contract. *Earls v. Chase Bank of Texas, N.A.*, 2002 MT 249, ¶ 12, 312 Mont. 147, 59 P.3d 364. If the language of a contract is unambiguous—i.e., reasonably susceptible to only one construction—the court must apply the language as written. *Mary J. Baker Revoc. Trust v. Cenex Harvest States*, 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851.

¶17     Again, the MSA's arbitration provision (§ XI(c)) provides, in relevant part, that

> [a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration.

¶18     In applying this provision, we must first identify the parties' "dispute, controversy or claim." The PMs frame the dispute in rather broad and imprecise terms. Specifically, they assert that the parties' dispute is over "the Auditor's determination not to apply the 2003 NPM Adjustment." As noted, the PMs lost the requisite percentage of market share

11

in 2003, and an economic consulting firm determined that the disadvantages imposed by the MSA were a "significant factor" contributing to that loss. These facts triggered an NPM adjustment; however, the MSA states that a Settling State's allocated payment "shall not" be subject to an NPM Adjustment if the Settling State continuously had a Qualifying Statute in full force and effect and diligently enforced the provisions of such statute. Yet, while the MSA provides comprehensive formulas for determining whether an NPM Adjustment is triggered, the MSA does not provide such formulas for evaluating "diligent enforcement" of a Qualifying Statute. Nor does it state what entity is responsible for conducting that evaluation. The Independent Auditor concluded that it was neither responsible nor qualified to determine diligent enforcement; and, for that matter, the parties did not suggest that the Independent Auditor should make this determination. Rather, the PMs argued that the Independent Auditor should presume that the Settling States had not diligently enforced Qualifying Statutes, while the Settling States argued in favor of the opposite presumption. The Independent Auditor ultimately adopted the Settling States' approach and presumed diligent enforcement, and *that* is what the PMs dispute—i.e., the Independent Auditor's decision to presume diligent enforcement rather than presume no diligent enforcement.

¶19 But that is not the dispute here. The State filed the instant action not to challenge any calculation, determination, or course of action actually performed, made, or chosen by the Independent Auditor. Rather, the State sought a declaration that Montana had, in fact, diligently enforced the provisions of §§ 16-11-401 to -404, MCA, during 2003. Notably, the PMs have not alleged that Montana did *not* diligently enforce these statutes.

12

In any event, the dispute in the present case, as framed in the State's motion, is whether Montana diligently enforced a Qualifying Statute. We reject the PMs' attempts to repackage the dispute in this case as something it clearly is not.

¶20 The second question is whether this dispute is one "arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor." We agree with the State that it is not. The Independent Auditor neither "calculated" nor "determined" whether Montana diligently enforced a Qualifying Statute. Rather, the Independent Auditor simply presumed that Montana did so, and we cannot agree that this constitutes a "determination" as contemplated by the MSA. To "presume" is "to suppose to be true without proof." *Merriam-Webster's Collegiate Dictionary* 923 (10th ed., Merriam-Webster 1997). To "determine," by contrast, involves something more affirmative, such as "to find out or come to a decision about by investigation, reasoning, or calculation." *Merriam-Webster's Collegiate Dictionary* 315. Here, the Independent Auditor refused to conduct any "investigation, reasoning, or calculation" regarding whether the Settling States had diligently enforced their Qualifying Statutes. In this connection, it is important to bear in mind that the Independent Auditor is defined in the MSA as "a major, nationally recognized, certified public accounting firm," whose duties are to calculate and determine the amounts of payments, to collect all information necessary to make such calculations and determinations, and to allocate such payments. The PMs point to nothing in the MSA supporting their contention that the parties intended for the Independent Auditor to interpret statutes and evaluate whether the prosecutorial activities of the state attorneys general amount to "diligent enforcement" of

13

those statutes. As the Independent Auditor itself stated, it is "not qualified" to make this determination.

¶21 We also agree with the State that the question of whether Montana diligently enforced a Qualifying Statute in 2003 does not "arise out of or relate to" any calculations or determinations that the Independent Auditor actually "performed" or "made." To be sure, the State's motion for declaratory order followed from the Independent Auditor's finding that the PMs lost the requisite percentage of market share in 2003 and from the economists' subsequent determination that the disadvantages imposed by the MSA were a significant factor contributing to that loss. But the State's motion in no way "arises out of or relates to" the Independent Auditor's market-share analysis. Indeed, that analysis has not been challenged. Rather, the State's motion relates to an issue (diligent enforcement) that the Independent Auditor explicitly refused to determine, and it is clear from the language of the arbitration provision that the parties intended to arbitrate only those disputes which arise out of or relate to calculations or determinations that the Independent Auditor actually "performed" or "made."

¶22 The PMs point to the parenthetical in the arbitration provision, emphasized here:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor *(including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i))* shall be submitted to binding arbitration.

14

The PMs contend that subsection IX(j) describes the NPM Adjustment and that the language of the parenthetical, therefore, mandates that all disputes "concerning" the "application" of an NPM Adjustment must be arbitrated.

¶23 Again, we disagree. As noted, "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. Moreover, "[w]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-4-101, MCA. Reading the parenthetical as the PMs urge, such that any dispute concerning the application of an NPM Adjustment must be arbitrated, would effectively nullify the limiting words "calculations performed by, or any determinations made by" the Independent Auditor. When the arbitration provision is read as a whole, it is clear that the parties intended to arbitrate only those disputes which involve calculations performed or determinations made by the Independent Auditor. The situations identified in the parenthetical are not "in addition to" those which come before the parenthetical. Rather, the parenthetical, which begins with the word "including," simply lists examples and affirms that any calculations or determinations actually performed or made by the Independent Auditor regarding "any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j)" are to be submitted to arbitration. In this regard, it is important to note that while subsection IX(j) does mention the NPM Adjustment, it makes no mention of "diligent enforcement" or the Settling States' exemption from the NPM Adjustment.

¶24    The PMs also contend that arbitration is compelled by the MSA's "single, unitary payment structure."  The PMs opine that if "payment-related disputes" are not resolved through "a single, nationwide arbitration" guided by "one clearly articulated set of rules," the result will be "chaos."  Moreover, the PMs argue that because granting one Settling State an exception to the NPM Adjustment effectively reduces the payments to any Settling States which do not qualify for this exception (pursuant to the reallocation provision, *see* ¶ 5, *supra*), nationwide arbitration of the "diligent enforcement" issue for all Settling States is necessary so that each state can participate.

¶25    We are not persuaded.  For one thing, our decision must be based on Montana law and the plain language of the arbitration provision, not on the PMs' policy arguments.  If the PMs intended for the "diligent enforcement" question to be arbitrated pursuant to "one clearly articulated set of rules" and with all Settling States present in one nationwide forum, the PMs certainly were capable of negotiating for this requirement in the MSA.  As it is, no such language and no such rules appear in the MSA.  Moreover, notwithstanding the PMs' apparent concern that some Settling States might suffer reductions to their allocated payments, the fact remains that the question of whether *Montana* diligently enforced *its* Qualifying Statute does not depend, in any way, on what the other Settling States have or have not done.  If Montana diligently enforced a Qualifying Statute, the NPM Adjustment does not apply to it; whether the other Settling States did the same is immaterial.

¶26    As for the PMs' desire for "one clearly articulated set of rules," the PMs' argument in this regard is undercut by the MSA's Governing Law provision, which states

16

that "[t]his Agreement . . . shall be governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State." In executing the MSA, the PMs clearly agreed to the application of various state laws, with the possibility of differing outcomes on a single issue. In this connection, § VII(f) of the MSA states:

> **Coordination of Enforcement.** The Attorneys General of the Settling States (through NAAG) shall monitor potential conflicting interpretations by courts of different States of this Agreement and the Consent Decrees. The Settling States shall use their best efforts, in cooperation with the Participating Manufacturers, to coordinate and resolve the effects of such conflicting interpretations as to matters that are not exclusively local in nature.

Given this provision, the PMs' concerns about "chaos" and no uniformity of decisions are somewhat overstated. Indeed, even if, as the PMs argue, "one clearly articulated set of rules" is preferable for deciding the "diligent enforcement" issue, this fact does not lead inevitably to the conclusion that nationwide arbitration is "compelled." Certainly the individual state courts are capable of applying uniform rules (should they be promulgated) in a consistent and evenhanded fashion to their respective Settling States.

¶27 Lastly, the PMs cite (in their briefs and in post-briefing notices of supplemental authority) a number of cases from other state courts, each of which concluded that the particular Settling State had agreed to arbitrate the issue of "diligent enforcement." Of course, those decisions are not binding on this Court. Moreover, they are of limited persuasive value given that we are applying Montana law to the particular claims raised by the State in its motion for declaratory order. And, while many of the decisions cited by the PMs appear simply to be following suit with the earlier decisions of other state courts, our independent review of the relevant provisions of the MSA and our application

of Montana's well-settled principles of contract interpretation require us to conclude that the State of Montana did not agree to arbitrate the question of whether it diligently enforced a Qualifying Statute.

**CONCLUSION**

¶28 The District Court erred in granting the PMs' motion to compel arbitration. We accordingly reverse the District Court's order and remand this case for further proceedings consistent with this Opinion.

¶29 Reversed and remanded.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶30 Courts in 48 states, including the First Judicial District Court for the State of Montana, have reviewed the issue in this case under their own state law, and have unanimously concluded that the Master Settlement Agreement (MSA) requires the issue to be submitted to arbitration. I do not agree with the Court that the uniqueness of Montana law requires a different conclusion. In my view, the Court has made analytical

errors in both the application of the law and in the interpretation of the provisions of the MSA which has led to an erroneous decision.

¶31 **I. Policies Favoring Arbitration.**

¶32 The decision in this case should not be made without consideration of the federal and state policies favoring arbitration. Although the Court acknowledges in passing that the manufacturers (OPMs) contend "that the law favors arbitration," the Court fails to consider the effect of this argument or the substantial body of law supporting it. The Court cites U.S. Supreme Court Cases for the standards and law relevant to deciding arbitration questions, but it ignores the parts of those same cases which concretely establish an approach strongly favoring arbitration. In *Mitsubishi Motors*, the U.S. Supreme Court stated that "any doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration . . . ." 473 U.S. at 626, 105 S. Ct. at 3353-54 (quotation omitted; emphasis added). In *AT & T Technologies*, the U.S. Supreme Court instructed that arbitration "should not be denied unless it may be said with *positive assurance* that the arbitration clause is *not* susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies*, 475 U.S. at 650, 106 S. Ct. at 1419 (quotation omitted; emphasis added). The fact that 48 jurisdictions, including 20 appellate courts, have determined that the arbitration clause here _is_ "susceptible of an interpretation that covers the dispute" should give us pause.

¶33 Our Court has likewise recognized this policy in favor of arbitration. *See Vukasin v. D.A. Davidson & Co.*, 241 Mont. 126, 785 P.2d 713 (1990); *Topolski v. Helena Assn. of Realtors, Inc.*, 2000 MT 343, ¶ 9, 303 Mont. 224, 15 P.3d 414. Although the Court

cites *Kingston*, ¶ 13, for the proposition that arbitration may not be ordered "if there is a substantial and bona fide dispute over whether there exists an agreement to arbitrate," that statement should be taken in its context—we held there that the district court erred in "not fully addressing whether a valid arbitration agreement exists" before looking to the policy favoring arbitration, which we nonetheless recognized. *Kingston*, ¶¶ 16, 20. Here, a valid arbitration agreement indisputably exists, and thus the policy favoring submission of this particular dispute to that arbitration agreement should be applied, and should form the backdrop of the interpretational issues raised herein.

¶34   **II. Interpreting and Applying the Contract Language.**

¶35   The parties dispute the Independent Auditor's decision to presume "diligent enforcement" by the State of Montana in determining the amount of the NPM Adjustment and, consequently, the final payment amount. Section XI(c) of the MSA states, in pertinent part, as follows:

> Resolution of Disputes. Any dispute, controversy, or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

¶36   I would first dispute the Court's conclusion about what is incorporated within this provision. In rejecting the OPMs' interpretation, the Court states that "it is important to note that while subsection IX(j) does mention the NPM Adjustment, it makes no mention of 'diligent enforcement' or the Settling States' exemption from the NPM Adjustment."

20

Opinion, ¶ 23. This is incorrect. Subsection IX(j) provides that "the NPM Adjustment shall be applied . . . pursuant to subsections IX(d)(1) and (d)(2)," and, in turn, subsection IX(d)(2) is the provision which establishes "diligent enforcement" and the Settling States' exemption. Contrary to the Court's view, the arbitration provision incorporates by reference the very provisions out of which the dispute in this case arises. Thus, the parenthetical phrase in the arbitration provision, which provides examples "without limitation" of disputes that should be arbitrated, specifically incorporates the "diligent enforcement" exception to the NPM Adjustment and the Settling States' exemption from the NPM Adjustment, and clearly demonstrates that these are areas in which the arbitration provision was intended to operate.

¶37    The Court further unduly narrows the scope of the parenthetical phrase. It states that the phrase "simply lists examples and affirms that any calculations or determinations actually performed or made" are to be submitted to arbitration. Opinion, ¶ 23. However, the parenthetical provides examples, not merely of *determinations*, but of *disputes concerning* such determinations ("including, without limitation, any dispute concerning . . . any of the adjustments"). The Court likewise fails to apply the "arising out of or relating to" language to this listing of disputes, to which I now turn.

¶38    A critical phrase within the arbitration clause is "arising out of or relating to." Within the context of arbitration, this phrase is interpreted nationally as playing the important role of signifying the intent to broadly require arbitration concerning the subject matter specified. In *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997), the court held that the term "relating to" in an agreement

"constitutes the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral disputes." *See also Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (an agreement requiring arbitration for "'any claim or controversy arising out of or relating to the agreement,' is the paradigm of a broad clause"); *Mitsubishi Motors*, 473 U.S. at 625, 105 S. Ct. at 3353, n. 13 ("[T]he exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to operate."). Thus, when interpreting the arbitration provision, the broad application which the law has given to "arising out of or relating to" should properly be considered.

¶39    Therefore, based upon a reading of the MSA as a whole, arbitration is required for (1) any dispute, controversy or claim, (2) arising out of or relating to (3) calculations performed by, or any determinations made by, the Independent Auditor (4) including, without limitation, disputes concerning the operation or application of any of the adjustments, including the NPM Adjustment, diligent enforcement, or the Settling States' exemption from the NPM Adjustment. Here, the Independent Auditor decided to presume "diligent enforcement" by the Settling States in determining the NPM Adjustment and the final payment. This decision resulted in a financial calculation which is more than one billion dollars different than had the Auditor decided to apply the NPM Adjustment without presuming "diligent enforcement." Given the law's policy favoring arbitration, and given the MSA's broad directive to arbitrate matters "relating to" calculations made by and "any determinations made by" the Auditor, including those

22

"concerning" the operation or application of adjustments, specifically, the NPM Adjustment, I would conclude that whether Montana diligently enforced its statute, which impacts the amount of the NPM Adjustment, is a dispute which must be arbitrated under the MSA.

¶40 I believe the Court has made interpretational errors in reaching the opposite conclusion, in addition to those discussed above. The Court's decision hangs on two propositions which are, in my view, extremely narrow and contrived interpretations of the MSA. First, the Court concludes that the Auditor did not actually make a "determination" regarding the NPM Adjustment, but, rather, merely made a "presumption" about the Adjustment. Distinguishing between dictionary definitions of "determine" and "presume," the Court concludes that the Auditor's action (which resulted in a billion dollar difference in the final payment calculation) was merely a presumption which fell outside of the arbitration provision. However, given that all controversies "related to" the Auditor's "calculations" or "determinations" are to be arbitrated, and are to be broadly interpreted, I must disagree with this narrow approach.

¶41 Secondly, the Court reasons that the Auditor, instead of making a calculation, actually "refused to conduct" any calculation or investigation here, and therefore, this dispute is not subject to arbitration because the MSA requires arbitration of only those calculations "that the Independent Auditor actually performed or made." Opinion, ¶¶ 20, 21. However, the Auditor had the responsibility of applying the NPM Adjustment and to do so, was forced to make a decision on diligent enforcement. It is undisputed that the Auditor did not fail to act—it acted by making the decision to presume diligent

23

enforcement. Again, under the policies favoring arbitration, I view the Court's approach to be a hyper-technical reading of the MSA.

¶42 The Court's approach does not truly ask whether the dispute *arises out of or relates to* an Auditor's determination, but, rather, narrowly asks whether a dispute *consists of* an Auditor's determination. The Court offers that the Auditor's market-share analysis "has not been challenged." Opinion, ¶ 21. Here, the Court has made an assumption that the Auditor is merely a glorified calculator, and that the MSA requires arbitration only of the Auditor's numerical calculations. I believe this is a significant narrowing of the plain language of the arbitration provision. Had the parties intended arbitration to be limited to the Auditor's calculations, I suspect the arbitration panel would have consisted of accountants instead of federal judges. In reality, the Auditor could not have "calculated" the final payment without making determinations concerning the NPM Adjustment and diligent enforcement.

¶43 I believe the Court has applied an overly narrow interpretation of the terms of the MSA and has failed to consider the policies favoring arbitration. I dissent and would affirm the District Court.

/S/ JIM RICE