DA 08-0360

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 287

HIGGINS DEVELOPMENT PARTNERS, LLC,

      Counterclaim Plaintiff and Appellee,

  v.

SKANSKA U.S.A. BUILDING, INC.,

      Counterclaim Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV-07-573
Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Michael G. Black; Black Law Office; Missoula, Montana
          (Counsel for Skanska, U.S.A. Building, Inc.)

          Jonathan J. Kudrna; Jardine, Stephenson, Blewett & Weaver, P.C.; Great
          Falls, Montana (Counsel for Employers Mutual Casualty Co.)

      For Appellee:

          Timothy D. Geiszler; Geiszler & Froines, P.C.; Missoula, Montana
          (Counsel for Higgins Development Partners, LLC)

          Scott M. Stearns; Boone Karlberg, P.C.; Missoula, Montana
          Cory R. Gangle; Milodragovich, Dale, Steinbrenner & Nygren, P.C.;
          Missoula Montana
          (Counsel for Metal Works of Montana, Inc. d/b/a Missoula Sheet
          Metal and Roofing, Inc.)

                    Submitted on Briefs:  May 6, 2009

                              Decided:  August 25, 2009

Filed:

_____
                   Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Skanska U.S.A. Building, Inc., (Skanska) appeals from an order entered by the Twenty-First Judicial District Court, Ravalli County, granting Higgins Development Partners, LLC's (Higgins) Motion for Injunction enjoining Skanska from pursuing a demand for arbitration filed with the American Arbitration Association. We affirm.

¶2      We restate the issue on appeal as follows:

¶3      Did the District Court err in enjoining Skanska from pursuing a demand for arbitration filed with the American Arbitration Association?

## BACKGROUND

¶4      The underlying claim in this matter arose out of the construction of an addition at the Rocky Mountain Lab in Hamilton, Montana. The National Institutes of Health (NIH) owns and operates the lab. NIH and Higgins entered into an agreement for the construction of an addition at the Rocky Mountain Lab known as the Integrative Research Facility. This facility is the first NIH facility to simultaneously house biosafety level 2, 3, and 4 laboratories.

¶5      On September 30, 2004, Higgins entered into a Construction Management Agreement (the "Agreement") with Skanska. The Agreement designated Higgins as the development manager and Skanska as the construction manager for the Integrative Research Facility. This Agreement is the subject of the present dispute between Higgins and Skanska. Under the Agreement, Skanska was charged with administering subcontracts for the addition. Metal Works of Montana, Inc., d/b/a Missoula Sheet Metal and Roofing, Inc., (Missoula Sheet Metal) received a subcontract from Skanska for

2

construction of the roof on the new addition. The subcontract between Skanska and Missoula Sheet Metal expressly incorporated by reference Skanska's contract with Higgins.

¶6     At some point after Missoula Sheet Metal installed the roof, a dispute arose over the quality of Missoula Sheet Metal's work. Higgins alleged that Missoula Sheet Metal's work on a section of the roof (Roof A) was defective. Higgins partially withheld payment to Skanska for that work. Missoula Sheet Metal, in turn, did not receive full payment from Skanska. Missoula Sheet Metal subsequently commenced an action against Skanska to recover approximately $50,000 under the subcontract. The subcontract contained a "pay-if-paid" clause that conditioned Skanska's obligation to pay Missoula Sheet Metal on Skanska receiving payment from Higgins.

¶7     On January 10, 2008, Skanska filed an answer, counterclaim, and third-party complaint against Missoula Sheet Metal's surety and Higgins. With respect to Higgins, Skanska alleged that Higgins failed to pay Skanska for the sums demanded by Missoula Sheet Metal and that, accordingly, Higgins was liable to Skanska to the extent it was deemed liable to Missoula Sheet Metal. Separately, Skanska also filed a demand for arbitration with the American Arbitration Association. Skanska's attorney described the nature of its dispute in the demand for arbitration as follows:

> Respondent Higgins Development Partners ("HDP") contracted with Claimant Skanska USA Building, Inc. ("Skanska") to serve as Construction Manager at Risk for a government project owned by the National Institute[s] of Health ("NIH"). HDP was the Development Manager for the project pursuant to its contract with NIH. Skanska performed work on the project for which it has not been paid by HDP. Skanska seeks damages for breach of contract against Higgins for the unpaid amounts. The Claims

3

against Higgins include the following, but Skanska's Demand may be amended to add additional claims.

The unpaid amounts referenced by Skanska in the demand for arbitration involved two Change Order Requests (Change Orders), which Skanska had submitted to Higgins for payment. The Change Orders at issue related to increased cooling work and ceiling grid adjustments that were performed on the addition. Specifically, Change Order 160, in the amount of $27,999, related to revisions in the acoustical ceiling grid layout after it was 90 percent complete. Change Order 260, in the amount of $196,397, related to increased cooling costs in a mechanical room. Through Higgins, NIH approved partial payment of these requests. Skanska did not reference the dispute over Sheet Metal's work on Roof A in its demand for arbitration.

¶8    Higgins responded to Skanska's request for arbitration by filing a Motion for Injunction with the District Court. Higgins argued that the Agreement did not allow dispute resolution through arbitration with the American Arbitration Association. Rather, Higgins claimed that any alternative dispute resolution would have to take place under the Federal Acquisition Regulations (FAR) or the Federal Contracts Disputes Act (CDA) and include NIH as a party. In support of its position, Higgins cited section 9.2.1. of the Agreement, titled "Dispute Resolution for the Construction Phase." Section 9.2.1. stated the following:

> Any other claim, dispute or other matter in question arising out of or related to this Agreement or breach thereof **that is determined to relate solely to the Development Manager's obligations during the construction phase** shall be settled in accordance with Article 4 of [American Institute of

Architects] Document A201 . . . unless the parties mutually agree otherwise.[1]

Section 9.2.1. of the Agreement also stated that:

> Claims, disputes or other matters in question between the parties **that do not relate solely to Development Manager's obligations, and involve the interests of the National Institutes of Health shall be resolved per the requirements of the FAR**, as outlined in the Development Manager's Agreement . . . .

¶9     Higgins argued that the dispute over the Change Orders (the only claims specifically noted in Skanska's demand for arbitration) did not relate solely to Higgins's obligations under the Agreement because the federal government (through NIH) owned the facility and was ultimately responsible for paying its construction costs. Further, Higgins stated that the "present litigation arose from the NIH rejection of Roof A and its refusal to pay [Higgins] for that roof." Because NIH, through Higgins, rejected the work on Roof A, Higgins reasoned that Section 9.2.1. of the Agreement required Skanska's dispute to be resolved under the FAR and CDA.

¶10     In response, Skanska argued that arbitration with the American Arbitration Association was proper because the claim generally arose "out of [Higgins's] non-payment of Skanska and its subcontractors for work performed at the [Rocky Mountain Lab] . . . ." Skanska drew a distinction between the underlying claim regarding the alleged defectiveness of Roof A and payment of the Change Orders and argued that the Change Orders related solely to Higgins's obligations (Skanska did not address directly

---

[1] At the time the parties entered into the Agreement, article 4.5.1. of the American Institute of Architects Document 201 stated that "[a]ny controversy or [c]laim arising out of related to the [c]ontract, or breach thereof" would be settled by arbitration through the American Arbitration Association.

whether the dispute over Roof A involved NIH's interests). As a jurisdictional matter, Skanska also argued that any question over whether dispute resolution would occur through arbitration or under the FAR requirements was a decision for the arbitrator, not the District Court. Finally, Skanska alleged that Higgins failed to properly certify the Change Order claims for resolution under the FAR and CDA. According to Skanska, Higgins was the only party that could initiate the FAR process, and Skanska maintained that Higgins refused or failed to do so.

¶11 The District Court granted Higgins's Motion for Injunction and enjoined Skanska from pursuing its demand for arbitration with the American Arbitration Association. The District Court concluded that NIH "was involved with [Higgins] in approving a reduced [Change Order] payment to Skanska" and that "[t]he disputes over payment of the [Change Orders did] not relate solely to Development Manager [Higgins's] obligations during the construction phase." On a separate matter, the District Court also concluded that there was no evidence that Higgins had refused or failed to properly process Skanksa's Change Orders or "timely engage" the FAR or CDA dispute resolution procedures. Skanska appeals.

**STANDARD OF REVIEW**

¶12 We review a district court's conclusions of law regarding arbitrability for correctness. *Ratchye v. Lucas*, 1998 MT 87, ¶ 14, 288 Mont. 345, 957 P.2d 1128. *See also Hubner v. Cutthroat Communs., Inc.*, 2003 MT 333, ¶ 4, 318 Mont. 421, 80 P.3d 1256.

## DISCUSSION

¶13    *Did the District Court err in enjoining Skanska from pursuing a demand for arbitration filed with the American Arbitration Association?*

¶14    The parties in this matter do not dispute the existence of an arbitration provision or challenge its validity. Each party recognizes that Section 9.2.1. of the Agreement provided two alternate dispute resolution methods—binding arbitration with the American Arbitration Association or resolution under the FAR or CDA dispute resolution procedures. Further, each party agrees that the determinative question is whether the claim or dispute in the present matter relates solely to Higgins's obligations as the development manager or whether it involves the interests of the NIH. If the claim or dispute relates solely to Higgins's obligations as the development manager, then Section 9.2.1. of the Agreement provides for binding arbitration with the American Arbitration Association. Alternatively, if the claim or dispute does not to relate solely to Higgins's obligations *and* involves the interests of the NIH, then dispute resolution must occur under the FAR requirements.

¶15    The District Court, as noted above, determined that the interests of the NIH were involved such that dispute resolution would have to occur under the FAR requirements. The District Court concluded that the dispute at issue, full payment of the Change Orders, did not relate solely to Higgins's obligations during the construction phase because Higgins discussed all disputed Change Orders with NIH and ultimately NIH approved, disapproved, or partially approved the Change Orders. In reaching this decision, the District Court relied heavily upon on an email message sent from Higgins to Skanska's

7

construction manager stating that NIH *and* Higgins had approved a portion of the sums in question. According to the District Court, this email was "sufficient to support a finding that the disputes over the increased dollar payment amounts requested in the [Change Orders] involve[d] NIH's interests."

¶16 Skanska argues that the District Court erred by granting the Order of Injunction in favor of Higgins in two primary respects. First, as a threshold matter, Skanska claims that if an agreement contains an arbitration provision, then the District Court cannot decide substantive issues pertaining to that agreement. Skanska cites our decision in *Larson v. Western States Ins. Agency, Inc.*, 2007 MT 270, ¶ 24, 339 Mont. 407, 170 P.3d 956, wherein we noted the general proposition that once a district court has determined the validity of an arbitration clause, then substantive issues under the agreement are reserved for the arbitrator. Skanska claims that since there is no dispute over whether the Agreement contains an arbitration provision, the arbitrator instead of the District Court should have decided whether the interests of the NIH were involved. Skanska also cites § 27-5-115(2), MCA, which provides, in relevant part, the following:

> On application, the district court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be immediately and summarily tried and the stay ordered if the court finds for the applying party. If the court finds for the opposing party, it shall order the parties to proceed to arbitration.

Skanska argues that the District Court erred in its application of § 27-5-115(2), MCA, because there was no "substantial and bona fide dispute" over whether the [Agreement] contained an arbitration provision.

8

¶17 Second, Skanska broadly asserts that the District Court erred in concluding that the interests of the NIH were involved and that arbitration could not proceed with the American Arbitration Association. Skanska claims that the dispute over payment of Change Orders 160 and 260 arose out of the Agreement and related solely to Higgins's obligations to Skanska. Moreover, Skanska contends that its demand for arbitration sought damages for claims that cannot be included in the FAR dispute resolution process. Skanska argues that because Higgins partially rejected the claims, Higgins cannot submit the claims in good faith to NIH for resolution under the FAR requirements.

¶18 In response, Higgins argues that its objection to arbitration was properly raised and decided by the District Court as opposed to the arbitrator. Higgins claims that § 27-5-115, MCA, "mandates the district court to review and to determine whether the subject disputes are subject to AAA arbitration or to the FAR procedures as described in Article 9.2.1[.] [sic]" of the Agreement and further, that arbitration proceedings can only extend to those disputes that the parties actually agreed to arbitrate. Higgins argues that for an arbitrator to determine Higgins's objection to arbitration, "it must first be shown by clear and unmistakable evidence that [Higgins] agreed to that forum." Because Section 9.2.1. stated that claims involving the interests of the NIH would be resolved pursuant to the FAR requirements, Higgins asserts that it neither intended nor agreed to arbitrate Skanska's Change Order claims. In addition, Higgins contends that the District Court correctly concluded that the interests of the NIH were involved. Higgins points out that the demand for arbitration only sought payment of the two Change Orders and argues that

9

NIH's interests were clearly involved since the demand sought specific sums of money that NIH would ultimately be required to pay.

¶19 State and federal policies generally favor arbitration when a valid arbitration agreement exists between the parties. This support is evidenced by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (2006), which establishes a strong national policy in favor of arbitration. In *AT&T Technologies, Inc., v. Communications Workers of America*, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (1986), the United States Supreme Court stated that arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (Internal quotations omitted.) *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353 (1985*)* (stating that doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.).

¶20 Nevertheless, the presumption in favor of arbitration is not absolute. The general rule, which we have affirmed numerous times, is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S. Ct. 1347, 1353 (1960); *see also Ratchye*, ¶ 14. Further, unless the parties clearly and unmistakably provide otherwise, "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Technologies*, 475 U.S. at 649, 106 S. Ct. at 1418. *See also First Options of Chicago v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920 (1995). The Ninth Circuit Court of Appeals clarified that:

> Arbitrability is ordinarily for courts, not arbitrators, to decide unless the parties agree otherwise. Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

*PowerAgent v. Electronic Data Systems*, 358 F.3d 1187, 1191 (9th Cir. 2004) (internal quotations and citations omitted). Therefore, while it is clear that our laws generally favor arbitration, the intent of the parties remains paramount to any determination of whether an agreement will be subject to arbitration as opposed to some other dispute resolution forum.

¶21 In addition, to determine whether the parties "agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *State v. Philip Morris, Inc.*, 2009 MT 261, ¶ 15, 352 Mont. 30, ___ P.3d ___. In Montana, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. Further, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA.

¶22 As noted above, the dispute resolution provision set forth in the Agreement stated that claims relating solely to the development manager's obligations would be settled in accordance with Article 4 of the American Institute of Architects—i.e. through binding arbitration with the American Arbitration Association. Claims that were determined not to relate solely to the development manager's obligations *and* which involve the interests of the NIH would be settled through the FAR requirements. However, Section 9.2.1. is

11

silent as to who—district court or some other forum—would decide whether the claim related solely to Higgins's obligations or whether the interests of the NIH were involved. In the absence of such language, it is clear that the District Court was the only appropriate forum to make this determination. While our policies generally favor arbitration, we cannot assume that the parties in this matter agreed to have an arbitrator decide whether the dispute would be submitted to arbitration or resolved under the FAR requirements when there is nothing within the four corners of the agreement to that effect.

¶23 Since the plain language of the Agreement does not designate a forum for deciding whether the interests of the NIH were involved, and further, since the parties did not clearly and unmistakably provide that an arbitrator would decide that question, we conclude that the District Court was the appropriate forum for deciding the dispute resolution forum for Skanska's claims.

¶24 This conclusion is consistent with our recent decision in *State v. Philip Morris Inc.*, wherein we concluded that the district court erred by ordering the parties to proceed with arbitration. *Philip Morris*, ¶ 28. In *Philip Morris*, we concluded that an arbitration agreement did not extend to a particular dispute between the parties (whether Montana diligently enforced its qualifying statutes, thus exempting the state from an adjustment to the tobacco litigation settlement) because the arbitration provision was limited to "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor . . . ." *Philip Morris*, ¶ 10. Because the Independent Auditor "neither 'calculated' nor 'determined' whether

12

Montana diligently enforced" the particular statute at issue, it could not be said that the dispute or claim arose out of or related to calculations performed by the Independent Auditor. Accordingly, we determined that the "State of Montana did not agree to arbitrate the question of whether it diligently enforced" its qualifying statute at issue and we reversed and remanded the decision to the district court for further proceedings.

¶25 Having reached the conclusion that the District Court was the proper forum for determining where Skanska's claims would be resolved, we now address whether Skanska's claim or dispute related solely to Higgins's obligations or whether it involved the interests of the NIH. In looking at the plain language of Section 9.2.1. and the Agreement as a whole, it is clear that while the Agreement provided two alternate dispute resolution methods, it failed to define how the term "interests" should be interpreted. In other words, there is no guidance in the agreement on how to determine if the interests of the NIH were involved. The problem stems from the use of the word "interests," which can be broadly interpreted in a variety of ways as evidenced by the arguments set forth by the parties. Generally "interest" denotes "legal share in something." *Blacks Law Dictionary* 816 (Bryan A. Garner ed., 7th ed., West 1999). Moreover, "legal interest" includes a pecuniary interest. Therefore, a reading of the plain language of the Agreement suggests that the FAR or CDA dispute resolution procedures would be invoked when NIH possessed a right or legal share in the dispute or when its pecuniary interests were involved. However, a more straightforward approach is to determine whether the "claims, disputes or other matters in question" between Higgins and Skanska

related solely to Higgins's obligations as the Development Manager under the Agreement.

¶26 As noted by the District Court in its Order of Injunction, Skanska's demand for arbitration sought to be paid "the full amounts still owed by [Higgins]" on Change Orders 160 and 260. The evidence suggested that NIH *and* Higgins approved partial payment of at least one of the Change Orders. For example, the District Court noted an email sent from Higgins to Skanska which stated the following:

> Attached for your records is the redlined IN 390, [Change Order] 260 covering the undisputed portion of the added cooling for the mechanical room. As the markup shows NIH and [Higgins] have approved the $61,200 cost. You may want to submit the other costs as a separate [Change Order] to be negotiated separately.

The District Court also received testimony at the hearing on Higgins's Motion for Injunction that Change Orders 160 and 260 sought additional money from NIH and that NIH ultimately had all fiscal authority and control over increases or decreases in project costs. Most importantly, however, is the evidence that Higgins discussed all disputed Change Orders with NIH and that NIH had the final authority to approve, disapprove, or partially approve Change Orders. Based on this evidence it is clear that payment of the Change Orders did not relate solely to Higgins's obligations as the development manager because NIH, as the owner and financier of the Integrative Research Facility at the Rocky Mountain Lab, had a clear financial interest in the dispute over payment of the Change Orders. This conclusion is supported by substantial evidence in the record. Because Skanska's claim or dispute, as referenced in the demand for arbitration, did not relate solely to Higgins's obligations and instead involved the interests of the NIH, the District

14

Court did not err in ordering the parties to resolve the dispute under the FAR or CDA dispute resolution procedures.

¶27 Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON

Justice Jim Rice, concurring.

¶28 I concur with the Court's decision herein. The Court describes the holding in *State v. Phillip Morris* and offers it as supportive. Opinion, ¶ 24. However, that case had nothing to do with the issue for which it is cited, that is, which entity—the district court or the arbitrator—should decide whether the dispute is arbitrable. *See Phillip Morris*, ¶ 13. Thus, the holding in *Phillip Morris* summarized in ¶ 24, from which I dissented, is irrelevant here. The appropriate reasons for determining that the district court was the proper entity to decide the arbitrability issue are set forth in ¶ 23. I concur with those reasons, as well as with the Court's determination, set forth in ¶¶ 25-26, that the District Court decided the issue correctly.

/S/ JIM RICE