*210 OPINION OF THE COURT
Allan L. Winick, J.
Application by petitioner Long Island Lighting Company (LILCO) to stay the arbitration noticed by respondent TrigenNassau Energy Corp. (Trigen) pursuant to CPLR article 78 is denied.
Pursuant to the Parallel Generation Agreement (the Agreement) between LILCO and Trigen dated December 28, 1988 as amended, LILCO agreed during the term of the Agreement, and any renewal or extension thereof, "to purchase and accept from Seller the Electricity produced at Seller’s Facility”. Electricity is defined in article 1 (G) of the Agreement as "the total amount of electric energy generated by the Facility, less electric energy consumed by the in-plant load of Seller’s Power Plant and other lawfully authorized dedicated uses”. Trigen constructed the facility in compliance with the Agreement and LILCO has purchased the electricity made available to it since 1988.
By letter dated August 23, 1994, Trigen advised LILCO of its plans to construct an inlet air-cooling system to facilitate greater efficiency of production at its plant in the warmer months of the year. In response, LILCO advised that it did not consider the proposed plant modification to be covered under the parties’ existing Agreement and further informed Trigen that it would not purchase any electricity from Trigen, at prices contained in the Agreement, that resulted from increased electrical output due to the proposed installation of the air-cooling system (LILCO letter dated Nov. 3, 1994). Thereafter, on February 8, 1995 LILCO received Trigen’s notice of intention to arbitrate seeking a declaration "that after Trigen-Nassau installs an air-cooling unit at the * * * electric cogeneration facility * * * LILCO will remain obligated to purchase all the electricity delivered to it by TrigenNassau under the terms and at the rates prescribed by the PGA [Parallel Generation Agreement]. Alternatively, TrigenNassau seeks a declaration that Trigen-Nassau is not inhibited by the PGA from selling to third parties any electricity generated by the Facility that exceeds the amount of electricity that LILCO is obligated to purchase under the terms of the PGA.”
LILCO’s instant application to permanently stay the requested arbitration is predicated on the two-pronged contention that (1) the issue raised in Trigen’s notice of intention to *211 arbitrate is not an arbitrable claim within the meaning of the Agreement’s dispute resolution provisions since Trigen merely seeks an advisory opinion and (2) even if the matter is deemed to be an actual claim or controversy, the arbitration provisions of the Agreement require that the matter be referred to the Public Service Commission (the PSC) since the issue of how much LILCO must pay for electricity to independent power producers like Trigen is one over which the PSC has exercised jurisdiction in the past. LILCO contends, moreover, that a new contract would have to be executed by the parties for the additional electricity generated as a result of the plant modification proposed by Trigen. Trigen counters that the PSC does not have exclusive jurisdiction over what it characterizes as a "contract dispute” which arises from and relates to the Agreement. In this regard, Trigen points to language contained in various rulings of the PSC which state that it will not generally arbitrate disputes between utilities and independent power developers over the meaning of contract terms because such questions do not involve the PSC’s authority under the Public Utility Regulatory Policies Act of 1978 and/ or Public Service Law § 66-c. (See, case 90-E-0975, Northeast Cogen, Inc. [petition for a declaratory ruling concerning a power supply agreement dated Apr. 1, 1987 with Niagara Power Corporation].)
Article XX, paragraph 1 of the Agreement herein provides with respect to dispute resolution as follows:
"1. Applicability
"(a) In any matter where the PSC has exclusive jurisdiction, any controversy or claim arising out of or relating to this Agreement, or any breach thereof, shall be resolved in accordance with the dispute resolution procedures of the PSC then in effect which are applicable to the parties.
"(b) In any matter where the PSC does not have exclusive jurisdiction, any controversy or claim arising out of or relating to this Agreement, or any breach thereof, shall be settled by arbitration, except as limited by paragraph 3 of this Article XX.”
Pursuant to CPLR 7503 (b) arbitration may be stayed "on the ground that a valid agreement was not made or has not been complied with or that the claim sought to be arbitrated is barred by limitation under subdivision (b) of section 7502”. None of these grounds serves as a predicate for LILCO’s petition, however. Moreover, LILCO’s justiciability argument *212 is without merit given the plain language of CPLR 7501 which provides that: "A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award. In determining any matter arising under this article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute.”
Notwithstanding LILCO’s arguments to the contrary, the issue raised in the notice of intention to arbitrate — i.e., whether, under the parties’ present Agreement, LILCO is obligated to purchase additional electricity produced by Trigen, after installation of the proposed inlet air-cooling system, under the rates prescribed by the Agreement — involves an interpretation of the terms of the subject Agreement and is for the arbitrator, not the PSC to decide.
The Federal Public Utility Regulatory Policies Act requires that public utility companies purchase electricity from qualifying cogeneration facilities such as Trigen (see, 16 USC § 824a-3). The PSC is charged with overseeing the contracting process and is statutorily bound to ensure that the amounts paid under-such contracts are just and reasonable to utility ratepayers and are in the public interest (16 USC § 824a-3 [b] [1]; Public Service Law § 66-c). (Matter of XIOX Corp. v Public Serv. Commn., 190 AD2d 350, 352, appeal dismissed 82 NY2d 790; Matter of Long Is. Light. Co. v Public Serv. Commn., 199 AD2d 831, lv denied 83 NY2d 755.)
Pursuant to Public Service Law § 66-c, the PSC is directed to fix the terms and conditions of such purchases it finds just and economically reasonable to the ratepayers, nondiscriminatory and in furtherance of the public policy of encouraging the development of alternate energy production facilities, etc. Under the statutory framework, the PSC performs the regulatory role of approving the terms and conditions of energy purchase agreements between public utilities and qualifying alternate energy production facilities, cogeneration facilities and small hydrofacilities.
Although LILCO is correct in the assertion that the issue of how much LILCO must pay for electricity to independent power producers is one over which the PSC has exercised jurisdiction in the past, the issue in this dispute does not *213 require the fact finder to determine and approve what is the proper rate to be paid for electricity under the Agreement. This has already been determined. As stated by the PSC in its declaratory ruling issued March 4, 1992 in Erie Energy Assocs. (case 92-E-0032 [petition for a declaratory ruling that its power purchase contract with New York State Electric & Gas Corporation remains in effect]): "Jurisdiction under the Public Utility Regulatory Policies Act of 1978 (PURPA) and PSL § 66-c is generally limited to supervision of the contract formation process. Once a binding contract is finalized, however, that jurisdiction is usually at an end.”
Arbitration is a favored and efficacious method of dispute resolution whereby parties select a nonjudicial forum for the expeditious and economical determination of their conflicts. The courts have fashioned a narrow common-law exception to the general rule of noninterference with the arbitral process when the issue submitted directly involves a strong public policy. Because of the general policy favoring arbitration, however, the conflict with public policy must appear on the face of the submission without requiring extended fact finding or legal analysis. At the very least, the public policy issue must be inextricably linked with the issue submitted. (Matter of Fallon [Greater Johnstown School Dist.], 118 AD2d 936, 937, lv denied 68 NY2d 603.) In the instant matter, there is no basis to conclude that the issue to be submitted to the arbitrator on its face involves a public policy issue.
Accordingly, LILCO’s application to stay arbitration is denied and the parties are directed to proceed with arbitration as provided under the Agreement herein.