**FILED**

October 30 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0702

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 362

GREATER MISSOULA AREA FEDERATION
OF EARLY CHILDHOOD EDUCATORS AND
RELATED PERSONNEL, MEA-MFT, AFT, NEA,
AFL-CIO,

       Plaintiff and Appellee,

v.

CHILD START, INC., WHITTIER SCHOOL,
MISSOULA, MONTANA,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and For the County of Missoula, Cause No. DV 2006-834
                Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Stacey Weldele-Wade, Antonioli & Wade, P.C., Missoula, Montana

       For Appellee:

              Karl J. Englund, Karl J. Englund, P.C., Missoula, Montana

                              Submitted on Briefs:  September 24, 2008

                                    Decided:  October 30, 2009

Filed:

_____

                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     The Greater Missoula Area Federation of Early Childhood Educators and Related Personnel, MEA-MFT, AFT, NEA, AFL-CIO (the Federation) commenced the instant action against Child Start, Inc. (Child Start) in September 2006 by filing a Complaint and Motion to Compel Arbitration.  The District Court granted the Federation's motion. Child Start then filed a motion under M. R. Civ. P. 60(b) for relief from the District Court's order.  The court denied this motion, and Child Start now appeals.  We affirm.

## ISSUE

¶2     The sole issue on appeal is whether the District Court erred in denying Child Start's Rule 60(b) motion.

## BACKGROUND

### The Grievance

¶3     This case involves an employer and the union representing its employees.  Child Start operates a Head Start early-childhood-development program at Whittier School in Missoula, Montana.  The Federation, a local union affiliated with MEA-MFT and its national affiliates, is the certified collective-bargaining representative for nonsupervisory employees of Child Start.

¶4     Child Start and the Federation are parties to a collective-bargaining agreement (the Agreement).  The stated term of the Agreement is January 1, 2003, through December 31, 2006, though Article One, Section 2 of the Agreement provides that the contract shall remain in full force until a new agreement is negotiated.  Of relevance to the present case, Article Two, Section 7 sets forth a "Grievance Procedure," the stated intent of which is to

2

resolve employee complaints "at the earliest possible step." A "grievance" is defined as "a complaint by an employee that there has been a violation, misinterpretation, or misapplication of the provisions of this agreement." An "employee" is defined as "(1) an individual employee or (2) a group of employees having the same grievance." Furthermore, "[a]ny employee, or group of employees, has the right to Union representation at any stage of the grievance procedure." Until the grievance is resolved, the employee proceeds through the following six steps:

Step 1: The employee discusses the grievance with the immediate supervisor.
Step 2: The employee submits the grievance to the immediate supervisor on a mutually approved form.
Step 3: The employee submits the written grievance to Child Start's director.
Step 4: The employee may appeal to Child Start's Policy Council.
Step 5: The employee may proceed to mediation before three mediators.
Step 6: The employee may proceed to binding arbitration.

¶5 In early 2006, Child Start faced rising costs without a corresponding increase in federal funding. Thus, Child Start decided that for budgetary reasons it would reduce by one week the number of weeks the program would operate during the school year. As a result, all employees' annual wages would be cut by 40 hours at their respective hourly rates, regardless of program priority, job position, or seniority rank.

¶6 On May 30, 2006, Karen Giuliani filed a grievance (using a Head Start Grievance Form) concerning Child Start's decision. At the time, Giuliani was an employee of Child Start and a member of the bargaining unit represented by the Federation. She also was president of the Federation. She named the Federation as the aggrieved party but indicated that the grievance was on behalf of "Several Affected" employees. Giuliani asserted that Child Start's decision to reduce the work year of bargaining-unit employees

3

"does not comply with the requirements of our Collective Bargaining Agreement regarding a reduction in force." She stated that the provisions of the Agreement on which the grievance was based "include but are not necessarily limited to" Article Two, Section 2 (the Job Security provision), which states, in relevant part, that in the event of "provable financial exigency necessitating a reduction in force," a management/union committee shall meet to examine personnel areas in which savings may be made. Furthermore, layoffs are to be made "on the basis of program priority," and reductions in force are to be made "on the basis of seniority." Giuliani requested that the reduction in the work year for bargaining-unit employees be rescinded and that Child Start conduct any necessary reduction in force in compliance with Article Two, Section 2. She also sought "any additional relief necessary to rectify this matter."

¶7 Giuliani's grievance proceeded through the Grievance Procedure outlined above. At each step, however, Child Start repeatedly refused even to recognize the grievance, let alone attempt to resolve it "at the earliest possible step." On June 6, 2006, Scot Anderson (Child Start's director) sent a letter to Giuliani asserting that the grievance was not a valid grievance because, in his view, it had not been filed by an individual employee, no group of employees had been identified, and the Federation as a whole did not qualify "because not all members have the same complaint." Anderson opined that the Federation had a "conflict of interest" in representing all bargaining-unit employees because their "individual interests differ according to whether they would or would not be laid off." Anderson concluded that "[n]o further action will be taken regarding the grievance." The Federation then gave notice of its intent to appeal to Child Start's Policy Council;

however, Anderson wrote a second letter reiterating his position that the grievance was not valid and asserting that "[s]ince there is no grievance, there will be no appeal." The Federation then gave notice of its intent to proceed to mediation; however, Sally Woodruff (president of Child Start's Board of Directors) issued a letter giving the same responses Anderson had previously given: the grievance was not valid, the Federation could not represent all of its members in this matter due to a supposed "conflict of interest," and Child Start would not take any further action regarding the grievance.

¶8 Having reached Step 6, the Federation gave notice of its intent to proceed to arbitration. To that end, the Federation sent a letter to the Department of Labor and Industry's Board of Personnel Appeals (BOPA) requesting a list of qualified arbitrators. Anderson, however, responded with a letter to BOPA stating that the grievance was invalid and that Child Start intended "to take no further action regarding this grievance." Indeed, he asserted that Child Start did not agree to arbitration or to participate in requesting the list of arbitrators and that Child Start "will not participate in the arbitration process, since we are not obligated to do so by the Master Contract." Shortly thereafter, Child Start implemented the one-week reduction. The 2006-2007 school year, which had been scheduled to start on August 14, 2006, instead started on August 21.

**The Federation's Motion to Compel Arbitration**

¶9 On September 6, 2006, the Federation filed its Complaint and Motion to Compel Arbitration under § 27-5-115, MCA, which states:

> (1) On the application of a party showing an agreement [to submit a controversy to arbitration] and the opposing party's refusal to arbitrate, the district court shall order the parties to proceed with arbitration; but if the

5

opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of that issue raised and shall order arbitration if it finds for the applying party or deny the application if it finds for the opposing party.

.   .   .

(5) An order for arbitration may not be refused on the ground that the claim in issue lacks merit or good faith or because no fault or grounds for the claim sought to be arbitrated have been shown.

The Federation contended that under this statute, the only issue before the District Court was "whether there is an agreement to arbitrate—not the merits of the claim or the nature of the defense to a claim." Here, the Federation argued, there is an agreement to arbitrate unresolved grievances like the one filed by Giuliani, and Child Start's objections as to the validity of the grievance are matters to be decided by the arbitrator.

¶10    Child Start responded with a motion to dismiss in which it raised a number of different points. As to the question of arbitrability, Child Start argued that the Agreement did not require the parties to arbitrate *all* disputes; rather, it required them to arbitrate only "properly filed" grievances. Child Start maintained that the grievance here was not properly filed for the reasons stated in Anderson's and Woodruff's letters. In addition, Child Start argued that there was no "grievance" at all because the Federation had not identified a "specific" violation, misinterpretation, or misapplication of the Agreement. Lastly, Child Start discussed the merits of the grievance. According to Child Start, "there is nothing in the [Agreement] which prohibits [Child Start] from shortening the length of the school year for budgetary purposes." To the contrary, Child Start asserted that Article One, Section 10 (the Management Rights provision) "legally authorized" it to decide, in

6

its "sole and exclusive discretion," to cut the length of the school year by one week rather than reduce the workforce. Moreover, Child Start argued that there had been no violation, misinterpretation, or misapplication of Article Two, Section 2 (the Job Security provision) because there had been no layoffs and no reductions in force.

¶11 In November 2006, while their respective motions were pending in the District Court, the parties settled a separate grievance concerning a pay increase. In conjunction with that settlement, the parties agreed that while the Federation "will continue to pursue resolution of its Reduction-In-Force (RIF) grievance," the Federation "will not seek a remedy requiring a back pay or other financial award for the one week reduction in the 2006-07 work schedule." They also agreed that "neither party makes any admissions with respect to its position on the validity and/or merits of the so-called RIF grievance by entering into this agreement" and that "this agreement sets no precedent."

¶12 The District Court issued its Opinion and Order on August 2, 2007, denying Child Start's motion to dismiss and granting the Federation's motion to compel arbitration. The court first observed that the parties did not dispute two points: the Agreement contains a valid and enforceable arbitration clause, and the arbitration clause applies to unresolved "grievances." The court also noted that the Federation had complied methodically with the procedural steps for pursuing a grievance, as set out in Article Two, Section 7. Thus, the court focused on the question of whether the complaint filed by Giuliani constituted a "grievance" under the Agreement.

¶13 In this regard, the court flatly rejected Child Start's contention that the grievance had not been filed by a proper party, observing that Article Two, Section 7 "expressly

7

gives the Federation clear contractual authority to bring the grievance on behalf of an identifiable 'employee, or group of employees.' " The court reasoned that an identifiable group of employees had been implicated and affected by Child Start's decision to cut the annual wages of all bargaining-unit employees by 40 hours at their respective hourly rates, regardless of program priority, job position, or seniority rank. Likewise, the court rejected Child Start's claim that the Federation's pursuit of the grievance compromised its duty to represent all of its members, noting that this was a contractual issue between the Federation and its members. Lastly, the court observed that Child Start's argument regarding the merits of the grievance "clearly reveals a contractual dispute under the terms of the Agreement"—namely, whether Child Start has "sole authority" under Article One, Section 10 to reduce the annual salaries of all employees, or whether Child Start has a duty under Article Two, Section 2 to meet with a union committee to examine personnel areas in which savings may be made when there is a provable financial need to make budgetary cuts affecting bargaining-unit employees. The court reasoned that an arbitrator, not the court, must resolve the parties' conflicting interpretations of the Agreement's provisions. For the foregoing reasons, the District Court concluded that the Federation's grievance is subject to the Agreement's arbitration clause, and the court accordingly ordered the parties to submit the grievance to arbitration.

**Child Start's Rule 60(b) Motion**

¶14     Child Start did not appeal the District Court's August 2, 2007 Opinion and Order. Rather, on August 31, Child Start filed a Rule 60(b) Motion for Relief from Judgment or Order. Relying on subsections (4), (5), and (6) of M. R. Civ. P. 60(b), Child Start asked

8

the court to vacate its Opinion and Order "due to events which transpired prior to this Court's order."[1] In particular, Child Start pointed out that the one-week reduction in the school year had occurred in August 2006 and that the Federation had agreed in November 2006 not to seek any financial award for the reduction in the work schedule. Child Start contended that rescission and monetary damages, therefore, were not available and that the Federation had not requested any other specific relief. Child Start thus reasoned that the matter is moot, as there is nothing to arbitrate and no relief to be granted; that mootness results in a loss of jurisdiction; and that the District Court's decision, therefore, is "void for lack of jurisdiction," entitling Child Start to relief under subsection (4). Alternatively, relying on the "equity" clause of subsection (5), Child Start argued that arbitration here would be "needless and wasteful" and would "damage all parties through the depletion of scarce financial resources." Similarly, invoking subsection (6), Child Start suggested that relief was appropriate because "intervening circumstances" had rendered arbitration on the Federation's grievance "moot and pointless." Child Start concluded that in the interests of "equity, common sense and judicial/administrative economy," the court should vacate its August 2, 2007 Opinion and Order.

¶15 In response, the Federation contended that Child Start had misidentified the actual controversy underlying the District Court's decision. That controversy, the Federation

---

[1] M. R. Civ. P. 60(b) states, in relevant part: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

9

argued, as defined by § 27-5-115, MCA, was whether there is an agreement between the parties to arbitrate unresolved grievances and whether the Federation's complaint constitutes a "grievance" under the Agreement. The Federation noted that the court had answered both questions in the affirmative and, thus, had granted the "relief" requested by the Federation (i.e., it ordered arbitration); and for this reason, the Federation disputed Child Start's assertion that the District Court lacked the ability to grant relief. The Federation further argued that the question of whether its grievance has become moot is a separate matter for the arbitrator, not the court, to decide. Nevertheless, the Federation pointed out that even with the passage of time, disputes still remained as to whether Child Start misinterpreted or misapplied the Agreement when it reduced the work year in lieu of implementing the seniority and layoff procedures and whether Child Start has sole authority to reduce unilaterally the work year and the annual salary of all employees or whether it has a duty to work first with the Federation.

¶16 The District Court rendered its decision on October 29, 2007, denying Child Start's Rule 60(b) motion. The court agreed with the Federation that the issues at hand are not moot. For one thing, the court observed, the contractual relationship between Child Start and the Federation "continues and is dependent on disputed interpretations of critical and material contract language." Furthermore, the court reasoned, Child Start "forced" these court proceedings to occur "by thwarting the grievance and arbitration provisions" of the Agreement and is likely to do so again "given the arbitrary and capricious manner" in which it dealt with the present grievance. As for Child Start's claim that it was entitled to equitable relief under Rule 60(b), the court quite clearly was

10

not persuaded in light of Child Start's conduct throughout the grievance process. For starters, the court found that Child Start's stated reasons for repeatedly refusing to recognize the Federation's grievance "bordered on the frivolous." For example, the court noted that Child Start had no legal right to refuse the grievance on the ground that the Federation might have a "conflict of interest" in pursuing it, as this was an issue solely between the Federation and its membership. Moreover, the court found that Child Start's "arrogant decision" to summarily refuse to honor the grievance process was "arbitrary and capricious" and that Child Start's "unreasonabl[e]" conduct had forced the Federation to file the present court action after expending significant time and effort to follow the steps for resolving grievances. Lastly, as to Child Start's claim that arbitration would be a financial burden, the court pointed out that had Child Start

> not arbitrarily and capriciously refused to perform its contractual duties under the bargaining agreement, the added expense of going to arbitration following this court proceeding would not have transpired, and therefore, [Child Start] is solely responsible for the added expense and cannot use it as an excuse for not arbitrating the procedural and substantive issues which are within the sole jurisdiction of the arbitrator under the bargaining agreement and statutory law.

The District Court concluded that Child Start's "continuing indefensible resistance" to arbitration must fail. Child Start now appeals.

## STANDARD OF REVIEW

¶17 Our standard of review of a district court's ruling on a motion under M. R. Civ. P. 60(b) depends on the nature of the final judgment, order, or proceeding from which relief is sought and the specific basis of the Rule 60(b) motion. *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶ 16, 338 Mont. 423, 166 P.3d 451. As a general rule, we

11

review the district court's ruling for abuse of discretion; however, different standards apply where the movant sought relief from a default judgment or where the movant sought relief under subsections (2) or (4) of Rule 60(b). *See Essex*, ¶¶ 16-17.

¶18 Here, Child Start invoked subsections (4), (5), and (6) in the District Court, and the Federation asserts that Child Start has "never clearly articulated" which subsection it is attempting to invoke. In its reply brief, Child Start acknowledges that it has cited subsections (4), (5), and (6) "in the alternative" but indicates that it is invoking only subsection (4). Accordingly, as Child Start contends, our standard of review is de novo. *See Essex*, ¶ 16 ("[W]here the movant sought relief under subsection (4) of Rule 60(b) on the ground that the judgment is void, the standard of review is de novo, since the determination that a judgment is or is not void is a conclusion of law.").

## DISCUSSION

¶19 Under M. R. Civ. P. 60(b)(4), a party is entitled to relief from a final judgment, order, or proceeding if the judgment is void. As it did in the District Court, Child Start maintains that the court's August 2, 2007 Opinion and Order directing the parties to proceed to arbitration is void. Child Start again points out that in August 2006 it implemented the one-week reduction in the work year with no attendant layoffs or reductions in force. Child Start also points out that the Federation agreed in November 2006 not to seek a remedy requiring back pay or other financial award for the one-week reduction. Child Start contends that these events effectively mooted the controversy between the parties and "thwarted" any relief that could have been granted in response to the Federation's grievance. Child Start thus reasons that the present action has been moot

since November 2006, if not earlier; that there is no justiciable controversy between the parties; and that the District Court consequently lacked jurisdiction when it issued its decision on August 2, 2007.[2]

¶20    The Federation responds that Child Start's mootness argument fails because it is incorrectly based on whether the issue to be presented to *the arbitrator* is moot, rather than on whether the issue before *the District Court* was moot. The Federation points out that the dispute underlying the District Court's August 2, 2007 Opinion and Order had nothing to do with the merits of its grievance. Rather, as defined by § 27-5-115, MCA, the specific dispute was whether the parties had an agreement to arbitrate the grievance. In this connection, the Federation suggests that Child Start is improperly attempting to narrow the range of grievances that are arbitrable under the Agreement. The Federation notes that a "grievance," as defined by the Agreement, includes a complaint that there has been a "misinterpretation or misapplication" of the Agreement's provisions, and the Federation observes that its grievance is just that: a complaint that Child Start misinterpreted or misapplied the Agreement by reducing the work year in lieu of implementing the seniority and layoff procedures. The Federation points out that although the one-week reduction has already occurred, and although it is not pursuing a financial award, there is nothing in the Agreement limiting arbitration of grievances to situations where the parties can be restored to their original positions or where monetary

---

[2] Recognizing that the factual basis for its mootness argument existed long before it filed its Rule 60(b) motion on August 31, 2007, Child Start offers the somewhat dubious explanation that "[c]ounsel for Child Start was not aware until *after* receipt of the District Court's August 2, 2007 Opinion and Order of the facts which made moot that decision."

damages are available. To the contrary, the Federation contends that the grievance and arbitration process is " 'a vehicle by which meaning and content are given to the collective-bargaining agreement' " (quoting *United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S. Ct. 1347, 1352 (1960)), and the Federation explains that an arbitrator's decision on the Federation's grievance will resolve the parties' "festering disputes" over the meaning of the Agreement—in particular, whether Child Start has sole authority to unilaterally reduce the work year or has a duty to work with the Federation under the Agreement's layoff and reduction-in-force procedures, and whether the president of the Federation may sign a grievance on behalf of the Federation's members.

¶21 Before considering these arguments, we first note the Federation's suggestion that "mootness is [not] properly raised within the context of a Rule 60(b)(4) motion." A judgment or order may be challenged as "void" under Rule 60(b)(4) on the ground that the rendering court lacked jurisdiction. *See e.g. Nikolaisen v. Advance Transformer Co.*, 2007 MT 352, 340 Mont. 332, 174 P.3d 940; *see also O'Rourke Bros. Inc. v. Nesbitt Burns, Inc.*, 201 F.3d 948, 951 (7th Cir. 2000) ("A judgment is void only if the court which rendered it lacked jurisdiction of the subject matter or of the parties, or if it acted in a manner inconsistent with due process of law."). It follows from this and from the justiciability and mootness principles discussed below that a judgment or order may be challenged as void (as Child Start does here) on the ground that the controversy between the parties was moot at the time the court rendered the judgment or order. *See e.g. Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202-03 (Fed. Cir. 2005).

14

**Justiciability and Mootness**

¶22    The judicial power of the courts of Montana is limited to justiciable controversies. *See Dukes v. City of Missoula*, 2005 MT 196, ¶ 15, 328 Mont. 155, 119 P.3d 61; *Powder River County v. State*, 2002 MT 259, ¶ 101, 312 Mont. 198, 60 P.3d 357; *cf. Flast v. Cohen*, 392 U.S. 83, 94-95, 88 S. Ct. 1942, 1949-50 (1968) (noting the same limitation on the judicial power of the federal courts).  This limitation derives in part from constitutional requirements and in part from policy or "prudential" considerations.  *See e.g. Montana Power Co. v. Montana Public Service Commn.*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91 (observing that the ripeness doctrine is grounded in both the constitution and judicial prudence); *Olson v. Dept. of Revenue*, 223 Mont. 464, 469-70, 726 P.2d 1162, 1166 (1986) (same with respect to the doctrine of standing); *cf. Flast*, 392 U.S. at 94-97, 88 S. Ct. at 1949-51.  Article VII, Section 4 of the Montana Constitution, in relevant part, confers original jurisdiction on district courts in "all civil matters and cases at law and in equity."  Mont. Const. art. VII, § 4(1).  This language has been interpreted as embodying the same sorts of limitations as those imposed on federal courts by the "case or controversy" provision of Article III, Section 2 of the United States Constitution.  *See Seubert v. Seubert*, 2000 MT 241, ¶ 17, 301 Mont. 382, 13 P.3d 365; *Olson*, 223 Mont. at 469-70, 726 P.2d at 1166.

¶23    The central concepts of justiciability have been elaborated into more specific categories or  doctrines—namely,  advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions—each of which is governed by its own set of substantive rules. *See e.g. Clark v. Roosevelt County,*

2007 MT 44, ¶ 11, 336 Mont. 118, 154 P.3d 48 (advisory opinions); *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶¶ 19, 31, 333 Mont. 331, 142 P.3d 864 (ripeness and mootness); *Columbia Falls Elementary School Dist. No. 6 v. State*, 2005 MT 69, ¶ 15, 326 Mont. 304, 109 P.3d 257 (political questions); *Armstrong v. State*, 1999 MT 261, ¶¶ 6-7, 296 Mont. 361, 989 P.2d 364 (standing); *Hardy v. Krutzfeldt*, 206 Mont. 521, 524-26, 672 P.2d 274, 275-76 (1983) (advisory opinions); *Carlson v. City of Helena*, 38 Mont. 581, 585, 101 P. 163, 164 (1909) (collusive cases); *see also* Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* vol. 13, § 3529, 612 (3d ed., West 2008). In the present case, we are concerned with the question of mootness. As we have previously observed, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Havre Daily News*, ¶ 31 (internal quotation marks omitted). Thus, if the issue presented at the outset of the action has ceased to exist or is no longer "live," or if the court is unable due to an intervening event or change in circumstances to grant effective relief or to restore the parties to their original position, then the issue before the court is moot. *See Powder River*, ¶ 101; *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, 974 P.2d 1150; *Serena Vista, LLC v. Dept. of Natural Resources and Conservation*, 2008 MT 65, ¶ 14, 342 Mont. 73, 179 P.3d 510; *Los Angeles County v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383 (1979). And because the constitutional requirement of a "case or controversy" contemplates real controversies and not abstract differences of opinion or moot questions, *Seubert*, ¶ 18; *cf.* Wright et al., *Federal Practice and*

16

*Procedure* vol. 13B, § 3533.1, 725-27, courts lack jurisdiction to decide moot issues insofar as an actual "case or controversy" no longer exists, *see Dennis v. Brown*, 2005 MT 85, ¶ 8, 326 Mont. 422, 110 P.3d 17; *Iron Arrow Honor Socy. v. Heckler*, 464 U.S. 67, 70, 104 S. Ct. 373, 374-75 (1983) (per curiam); *Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1253 (9th Cir. 1984); *see also Ballas v. Missoula City Bd. of Adjustment*, 2007 MT 299, ¶¶ 15-16, 340 Mont. 56, 172 P.3d 1232.

**Application of Mootness Principles**

¶24 The issue as framed by Child Start is whether a district court lacks jurisdiction to render a decision on a motion to compel arbitration of a dispute that the opposing party contends has become moot. This Court has not previously addressed this issue directly, but we note that some federal and state courts have. In fact, the parties rely on several cases from other jurisdictions in support of their respective positions. We will consider these authorities for their persuasive value in resolving the mootness issue presented.

¶25 At the outset, it is necessary to clarify the focus of our analysis in light of two related points raised by the parties. First, in both the District Court and this Court, Child Start has repeatedly confused the justiciability requirement's applicability to *courts*, as opposed to *arbitrators*. For example, relying on our statements in ¶ 14 of *Serena Vista* that "[w]e do not render advisory opinions, and we limit our rulings to those matters in which we can grant effective relief," Child Start contends that all an arbitrator could do regarding the Federation's allegedly moot grievance is render an "advisory opinion" answering "abstract questions," which Child Start contends is "not appropriate" under *Serena Vista*. It is essential to keep in mind, however, that arbitration is a matter of

contract, *Solle v. Western States Ins. Agency*, 2000 MT 96, ¶ 22, 299 Mont. 237, 999 P.2d 328, and the arbitrator's authority derives from and is limited by *the parties' agreement*, not the case-or-controversy provision of the Constitution, *see Miller v. County of Glacier*, 257 Mont. 422, 427-28, 851 P.2d 401, 404 (1993); *Terra West Townhomes, LLC v. Stu Henkel Realty*, 2000 MT 43, ¶ 27, 298 Mont. 344, 996 P.2d 866; *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 744, 101 S. Ct. 1437, 1446 (1981). As one court has pointed out, "[t]here would be nothing improper or illegal (and certainly not unconstitutional) about an arbitration panel resolving a dispute that would have to be dismissed from federal court because it did not constitute a case or controversy." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004); *cf.* Wright et al., *Federal Practice and Procedure* vol. 13B, § 3533.1, 728 (noting that an administrative agency is not bound by constitutional limits and may be empowered to maintain proceedings that would be moot in a court). Likewise, there is no basis under Montana law for Child Start's proposition that an arbitrator may not resolve a dispute which does not constitute a "case or controversy" under Article VII, Section 4(1). Along these same lines, we note that an arbitrator has broad power to fashion remedies on issues the parties have empowered the arbitrator to resolve, and in some instances the arbitrator may be authorized to grant relief that could not be granted by a court of law or equity. *See* § 27-5-312(2), MCA; *Nelson v. Livingston Rebuild Center, Inc.*, 1999 MT 116, ¶¶ 18-19, 294 Mont. 408, 981 P.2d 1185; *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 281 (1st Cir. 1983); *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 937 (10th Cir. 2001); *see also e.g. Wallace v. Hayes*, 2005 MT 253, ¶ 40, 329 Mont. 23,

124 P.3d 110; *United Steelworkers of America v. USX Corp.*, 966 F.2d 1394, 1402 (11th Cir. 1992). For these reasons, Child Start's application of justiciability doctrines as limits on the arbitrator's authority is misplaced. In evaluating Child Start's motion under Rule 60(b)(4), our focus is on whether there was a "live" case or controversy *in the District Court*, not whether there would be one in front of the arbitrator.

¶26 This leads into the second point. The Federation has consistently maintained that the question of whether its grievance is moot is for the arbitrator to decide. The Federation cites some cases, and we have found others, which support this proposition. *See e.g. W. Dow Hamm III Corp. v. Millennium Income Fund, LLC*, 237 S.W.3d 745, 757 (Tex. App. 1st Dist. 2007) ("[W]hether matters sought to be arbitrated are in fact moot is a question of procedural arbitrability that is reserved for the arbitrator, absent the parties' agreement to the contrary."); *Oil, Chemical and Atomic Workers Intl. Union v. Conoco, Inc.*, 64 Fed. Appx. 178, 185 (10th Cir. 2003) (unpublished[3]) ("Given the tightly circumscribed role that the courts are assigned in determining arbitrability, and considering that arbitrators have broad equitable powers to fashion remedies, it is not for us to decide that a remedy will not be available for a particular grievance."); *Galveston Maritime Assn. v. South Atlantic & Gulf Coast Dist.*, 234 F. Supp. 250, 251-52 (S.D. Tex. 1964); *Western Automatic Mach. Screw Co. v. Intl. Union*, 335 F.2d 103, 105-06 (6th Cir. 1964). The Supreme Court has stated that a gateway dispute about whether the parties

---

[3] Unpublished decisions of other courts may be cited as legal authority to the extent the rules of the rendering court allow. *McDonald v. Dept. of Envtl. Quality*, 2009 MT 209, ¶ 53, 351 Mont. 243, 214 P.3d 749. Under 10th Cir. R. 32.1, unpublished decisions issued prior to January 1, 2007, "are not precedential, but may be cited for their persuasive value."

are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S. Ct. 588, 592 (2002). Likewise, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. *Howsam*, 537 U.S. at 84, 123 S. Ct. at 592. But "procedural questions" which grow out of the dispute and bear on its final disposition—such as time limits, waiver, notice, laches, estoppel, and whether the steps of a grievance procedure were completed—are presumptively *not* for the court, but for an arbitrator, to decide. *Howsam*, 537 U.S. at 84-85, 123 S. Ct. at 592; *see also Klay*, 376 F.3d at 1109 ("Generally speaking, courts are empowered to resolve disputes that solely involve whether a particular claim should be resolved in court or arbitration. Arbitrators, on the other hand, are empowered, absent an agreement to the contrary, to resolve disputes over whether a particular claim may be successfully litigated anywhere at all (due to concerns such as statute of limitations, laches, justiciability, etc.), or has any substantive merit whatsoever." (citation omitted)). Likewise, this Court has indicated that although the question of whether the parties agreed to arbitrate is, as a general rule, to be decided by the court, *see Higgins Dev. Partners, LLC v. Skanska U.S.A. Bldg., Inc.*, 2009 MT 287, ¶ 20, 352 Mont. 243, 216 P.3d 199, procedural questions such as "the arbitrability of an indisputably arbitrable issue" are for the arbitrator to decide, *see Intl. Bhd. of Elec. Workers v. Montana Power Co.*, 280 Mont. 55, 60-61, 929 P.2d 839, 842-43 (1996). *Cf.* § 27-5-115(5), MCA ("An order for arbitration may not be refused on the ground that the claim in issue lacks merit or good faith or because no fault or grounds for the claim sought to be arbitrated have been shown.").

20

¶27 In light of these authorities, and since the Agreement does not provide otherwise, we agree with the Federation that the question of whether its grievance is moot is for the arbitrator, not the District Court, to decide. Necessarily, then, we also agree with the Federation that the District Court's jurisdiction over the present case does not turn on whether the Federation's grievance is moot. This does not mean, however, that mootness doctrine does not apply to motions to compel arbitration of labor disputes. It only means, as previously indicated, that the focus of the mootness question is *not* on whether the issues raised in the grievance are themselves "live." The "case or controversy" presented to the District Court in this case was the narrow question of whether the Agreement's arbitration clause applied to the Federation's grievance. *See* § 27-5-115(1), MCA. It follows, therefore, that the specific question we must answer in resolving Child Start's Rule 60(b)(4) motion is whether this "case or controversy" was "live" at the time the District Court rendered its August 2, 2007 decision. *Cf. Klay*, 376 F.3d at 1110 n. 19 ("Of course, if a party makes a motion to compel arbitration under 9 U.S.C. § 4, a district court must determine if there exists a case or controversy in order for it to exercise its jurisdiction over that motion to compel. . . . [T]he absence of a case or controversy requires a court to abstain from mandating arbitration . . . ."). We conclude that it was.

¶28 It would be one thing if the Federation had decided to withdraw its grievance during the pendency of the District Court proceedings. At that point, the issue presented at the outset of this action—whether the Agreement's arbitration clause applied to the Federation's grievance—would have become a purely academic point. The parties would have lost their legally cognizable interest in the outcome, and the court would have been

unable to grant effective relief. Indeed, the court would have been left in the position of issuing an advisory opinion on whether the arbitration clause applied to a nonexistent grievance. In short, the case would have become moot, and the District Court would have been bound to dismiss it for lack of jurisdiction. *See Indep. Union of Flight Attendants v. Pan American World Airways, Inc.*, 966 F.2d 457, 459 (9th Cir. 1992) (a party's decision to withdraw a claim renders it moot); *Dennis v. Brown*, 2005 MT 85, ¶ 8, 326 Mont. 422, 110 P.3d 17 (courts have no jurisdiction to answer moot questions); *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, 293 Mont. 188, 974 P.2d 1150 (a case that has become moot must be dismissed); *accord Great Western Sugar Co. v. Nelson*, 442 U.S. 92, 99 S. Ct. 2149 (1979) (per curiam). The same result would have obtained had Child Start withdrawn its objections to arbitration and proceeded to arbitrate the Federation's grievance. At that point, there would have been no case or controversy before the District Court.[4]

¶29 But no such events transpired here. The Federation has continually pursued its complaint related to Child Start's decision to reduce the work year by one week. The Federation reached the last step of the Grievance Procedure—arbitration—but Child Start refused to participate in arbitration. So, the Federation commenced the present action solely to compel Child Start to submit to the arbitration. Child Start responded that the

---

[4] That was essentially the situation in *Great Western Sugar*, on which Child Start relies heavily. Nelson sued to compel arbitration, the district court granted the motion, and Great Western Sugar appealed. But before the appeal could be decided on the merits, the arbitration proceedings were completed. Thus, the Supreme Court concluded that the court case had become entirely moot and that dismissal was required. *See Great Western Sugar*, 442 U.S. at 93-94, 99 S. Ct. at 2150. In contrast, the arbitration sought by the Federation here has not even been started, let alone completed.

Agreement's arbitration clause does not apply to the Federation's complaint. Child Start maintained this position throughout this litigation. The District Court was in a position to grant effective relief by either granting the Federation's motion to compel arbitration or granting Child Start's motion to dismiss. This constitutes a "live" case or controversy, which still existed on August 2, 2007, when the District Court issued its decision.

¶30 Most of Child Start's arguments to the contrary are directed to the question of whether the issues raised in the Federation's grievance are moot—a question, as noted, for the arbitrator to decide. But Child Start does raise two points requiring some discussion. First, Child Start contends that the Federation's grievance does not qualify for arbitration because the Federation is not seeking any specific relief. Child Start points out that the Federation originally sought rescission of the one-week reduction in the work year, which is no longer possible since Child Start implemented the reduction in August 2006, and that the Federation agreed in November 2006 not to seek a financial award. We note, however, that Child Start expressly conceded in the November 2006 settlement that the Federation "will continue to pursue resolution of" its grievance—an implicit acknowledgement that the Federation was seeking some other form of relief. In this regard, the Federation points out that under Article Two, Section 7, a complaint regarding an interpretation or application of a provision of the Agreement may be pursued to arbitration; and here, the basis of the Federation's grievance is that Child Start misinterpreted or misapplied provisions of the Agreement, including Article Two, Section 2 (the Job Security provision). In its grievance, the Federation requested Child Start's compliance with Article Two, Section 2 plus "any additional relief necessary to

23

rectify this matter." The Federation explains that in light of its ongoing contractual relationship with Child Start, it seeks resolution of the parties' conflicting interpretations of the Agreement; and citing *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1205 (9th Cir. 1989) (en banc), the Federation contends that the arbitrator is "the parties' officially designated 'reader' of the contract . . . their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary" (ellipsis in original, some internal quotation marks omitted). We agree that an arbitrator may serve to resolve disputes over the interpretation or application of a collective-bargaining agreement, *see Intl. Bhd. of Elec. Workers*, 280 Mont. at 58, 929 P.2d at 841; *see also United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S. Ct. 1347, 1351 (1960) (noting that "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself"), and here, Article Two, Section 7, clearly authorizes the arbitrator to resolve such disputes arising out of the Agreement. We also agree that an arbitrator is not constrained by Article VII, Section 4(1)'s case-or-controversy requirement and may grant relief that might not be available in a court of law or equity. *See* ¶ 25, *supra*. Thus, it follows from all this that a simple interpretation of the Agreement (which Child Start characterizes as an "advisory opinion" by the arbitrator) is in fact a form of "relief" available under the Agreement and requested by the Federation here.[5]

---

[5] Child Start cites *District 2, Marine Engineers Beneficial Assn. v. Isbrandtsen Co.*, 226 N.Y.S.2d 883 (Sup. Ct. 1962), for the proposition that "an actual case or controversy [is] a prerequisite for any adjudication whether in the courts or by arbitration." However, to the extent *District 2* stands for this rule, subsequent decisions

¶31    Second, Child Start contends that the Federation cannot pursue arbitration of a grievance that is based on an expired contract. Yet, while the Agreement's stated term is January 1, 2003, through December 31, 2006, Article One, Section 2 provides that the Agreement shall remain in full force until a new agreement is negotiated, and there is no evidence in the record that a new agreement has been negotiated.[6] Furthermore, it should be noted that the expiration of a collective-bargaining agreement does not necessarily extinguish a grievance or a party's obligation to arbitrate it. *See Providence Journal Co. v. Providence Newspaper Guild*, 308 F.3d 129, 132 (1st Cir. 2002) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 204, 111 S. Ct. 2215, 2224 (1991), and *Nolde Bros., Inc. v. Bakery and Confectionery Workers Union*, 430 U.S. 243, 255, 97 S. Ct. 1067, 1074 (1977)); *see also e.g. Solle v. Western States Ins. Agency*, 2000 MT 96, ¶¶ 26-29, 299 Mont. 237, 999 P.2d 328. For example, the obligation to arbitrate survives expiration where (as here) the dispute arose during the life of the contract but arbitration proceedings had not begun before expiration. *See Intl. Union v. Telex Computer Prods., Inc.*, 816 F.2d 519, 522 (10th Cir. 1987) (citing *Nolde Bros.*, 430 U.S. at 251, 97 S. Ct. at 1071-72). And although the Federation is seeking an interpretation of a purportedly expired contract, the fact is that Child Start and the Federation still have a

suggest that it is no longer a correct statement of the law in New York. *See e.g. Bd. of Educ. v. Merrick Faculty Assn.*, 410 N.Y.S.2d 876, 879 (App. Div. 2d Dept. 1978); *Long Island Lighting Co. v. Trigen-Nassau Energy Corp.*, 628 N.Y.S.2d 222, 224 (Sup. Ct. 1995). Likewise, Child Start's reliance on *Portland Web Pressmen's Union v. Oregonian Publg. Co.*, 286 F.2d 4 (9th Cir. 1960), is unpersuasive, as the parties' controversy in that case was specifically covered by the Labor Management Relations Act, not the collective-bargaining agreement.

[6] Indeed, Child Start indicates, without explanation, that it does not know "if any new contract even exists" as of the date of its reply brief in this appeal (April 24, 2008).

collective-bargaining relationship which, as the District Court noted, "is dependent on disputed interpretations of critical and material contract language." *Cf. Intl. Assn. of Machinists and Aerospace Workers v. BF Goodrich Aerospace Aerostructures Group*, 387 F.3d 1046, 1049 (9th Cir. 2004) (noting that courts long have been aggressive in determining that a collective-bargaining dispute remains live where the disputed issue continues to shape the parties' periodic bargaining or day-to-day interaction).

## CONCLUSION

¶32 We conclude that a "live" case or controversy existed throughout the proceedings in the District Court. This case was not moot when the court issued its August 2, 2007 Opinion and Order, and that order is not void under Rule 60(b)(4). Accordingly, the District Court did not err in denying Child Start's Rule 60(b) motion.[7]

¶33 Affirmed.


/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE


Justice W. William Leaphart, concurring.

¶34 I agree with the Court's analysis and framing of the issue as whether there was a "live" case or controversy in the District Court. The Court concludes that since the

---

[7] The Federation has requested that we award sanctions against Child Start for this appeal pursuant to M. R. App. P. 19(5). However, we do not agree that Child Start's appeal meets the requirements of this rule. The Federation's request is, therefore, denied.

grievance sought "any additional relief necessary," it was appropriate for the arbitrator to resolve the parties' conflicting interpretations of the Agreement, even though the specific concerns giving rise to this dispute were fait accompli. Given that the grievance sought any "additional relief necessary to rectify *this matter*," (i.e., the particular layoff at issue), allowing the matter to proceed to arbitration as an abstract interpretation of contract hangs on a very thin thread. However, in the interest of liberally interpreting pleadings, I give the grievance the benefit of the doubt.

¶35 Obviously, if the grievance had specifically sought declaratory relief rather than being so focused on the one-week reduction, the Court would not have to divine the pleader's true intent under the catch-all prayer for "any additional relief necessary."

/S/ W. WILLIAM LEAPHART